**AUSTIN, Com'r, v. CONNELLEE.   (No. 222.)**

(Court of Civil Appeals of Texas.  Eastland.
Feb. 25, 1927.  Rehearing Denied
March 25, 1927.)

**1. Banks and banking ⏄43—Written agreement between banking commissioner and stockholder superseded oral agreement concerning assessment.**

Stockholder's relation to bank respecting assessment on stock was determined under written agreement between banking commissioner and directors which he signed, irrespective of prior oral agreement.

**2. Banks and banking ⏄47(3)—Stockholder's assessment under agreement with banking commissioner for credit thereof on statutory liability if bank subsequently closed, held for bank's benefit and not creditable on liability.**

Deposits under banking commissioner's agreement with directors for assessment to be deposited in special account, and in event of failure to be credited on statutory liability, were for bank's benefit and not statutory payment for ratable distribution to creditors after failure.

**3. Banks and banking ⏄47(3)—Stockholder consenting to use of funds to strengthen bank cannot after failure allege payment of stock assessment.**

Stockholder participating or consenting in use of funds to strengthen bank, or for other purpose than ratable distribution to creditors, is charged with knowledge of banking commissioner's duty to levy 100 per cent. assessment for benefit of creditors upon bank's closing, and cannot assert he has paid assessment.

**4. Banks and banking ⏄47(3)—Assessment before closing not distributed ratably among creditors was no defense to banking commissioner's suit on stockholder's liability.**

Banking commissioner was not estopped to assert statutory liability against stockholder by appropriation to indebtedness, loss from which would have been sustained by guaranty fund, of assessment paid before bank's failure under prior commissioner's agreement for credit on liability, where appropriation was not ratable among creditors.

**5. Banks and banking ⏄47(3)—Commissioner's letter acknowledging less sum as payment of stockholder's statutory liability in failed bank held not estoppel in suit for balance.**

Banking commissioner's letter to stockholder acknowledging receipt of $2,000 as full payment of assessment for statutory liability in failed bank did not estop commissioner from asserting claim for balance of $1,000 for which stockholder was liable.

Appeal from District Court, Eastland County; George L. Davenport, Judge.

Action by Chas. O. Austin, Commissioner, against C. U. Connellee. From an order overruling a demurrer to the defendant's special answer, plaintiff appeals. Reversed and rendered.

Spencer & Rogers, of San Antonio, for appellant.

Chastain & Judkins, of Eastland, for appellee.

HICKMAN, J. This case was tried jointly with the case of Chas. O. Austin, Commissioner, v. M. H. Fleming, 290 S. W. 835, decided in an opinion by this court on February 11, 1927. The suit grew out of an assessment, levied by the appellant in his official capacity, against the appellee as a stockholder in the First State Bank of Eastland, at the time this bank went into the hands of the appellant for liquidation. The statement of facts includes practically all of the facts established in the Fleming Case and seems to be a carbon copy thereof, but additional facts appear in this case which were not introduced in the Fleming Case. The pleadings differ in some respects, but the effect of the special answer of the appellee is the same as that of the special answer of the appellee in the Fleming Case.

For the reasons stated in the opinion in the case of Chas. O. Austin, Commissioner, v. M. H. Fleming, above referred to, the demurrer of appellant to the special answer of appellee is sustained, and the judgment of the trial court overruling the demurrer is set aside.

We remanded the Fleming Case for further proceedings in the trial court, because it appeared from the evidence that he probably had a defense to appellant's cause of action, if properly pleaded, and, inasmuch as the demurrer to his answer had been overruled and he had never been called upon or given opportunity properly to plead the defense, we concluded that justice would best be served by remanding that case for a new trial. In this case, it is our decision that the appellee, Connellee, has no defense to appellant's suit against him, and that therefore there is no sound reason for remanding the case for further proceedings.

While, as stated, this case was tried jointly with the case of Austin v. Fleming and both appellee and appellant, in their briefs, regard the two cases as companion cases, yet we have concluded that the two cases rest upon different facts and different principles, and therefore require different rulings. We held in the Fleming Case that there was evidence in the record tending to establish the fact that the money paid by him to T. L. Overby was a trust fund. This was based upon the fact that the payment made by him was by virtue of an oral agreement between Mr. Overby, representing the First State Bank of Eastland, and Ed Hall, then commissioner of insurance and banking of the state of Texas, whereby it was agreed that the money should be paid to Overby and held by him in trust until it could be determined whether or not a certain sum could be raised, and in the event it was raised, such sum should be invested in the new capital stock of the bank. The record disclosed that after the sum was paid by Fleming, he knew nothing further about any future transactions with Ed Hall or his successor in office. Fleming was not an officer of the bank and did not participate in any other contracts, as disclosed by the record in his case.

The record in the instant case discloses a different situation. We are unable to determine from an examination of it just when the appellee, Connellee, paid his money into the so-called trust fund. His testimony is to the effect that it was paid about January, 1923, under an agreement with J. L. Chapman, banking commissioner. The ledger introduced in evidence would indicate that it was paid about June, 1922, at the time when the Fleming payment was made. If it were, in fact, paid under the oral agreement with Ed Hall, it would obviously be controlled by the same rules as those announced in our former opinion, but for the fact that later transactions between the appellee, Connellee, and the banking commissioner changed the character of the deposit and the relation between the depositor and the bank. The facts disclose that the plan agreed upon between Ed Hall, the commissioner, and the bank, to the effect that the bank should undertake to procure its stockholders to raise a trust fund of $100,000, with the understanding that if such fund were raised, the commissioner would draw upon the guaranty fund for sufficient money to make the bank a "clean bank" and the trustee should invest the fund so raised by him in new capital stock for the bank, was never consummated, but that it was determined prior to January, 1923, that the plan was not feasible.

In the meantime, J. L. Chapman had succeeded Ed Hall as commissioner. In company with Wallace Hawkins, as Assistant Attorney General of Texas, J. L. Chapman came to Eastland the latter part of January or the first of February, 1923, after it had been determined that the plan suggested by Ed Hall could not be carried into execution, and a contract was entered into between the directors of the bank and the commissioner on that occasion, which was later reduced to writing in the form of a letter and an acceptance thereof, which letter and acceptance and the supplemental letter of explanation are as follows:

"Austin, Tex., Feb. 9, 1923.

"First State Bank, Eastland, Texas—Gentlemen: Referring to our conversation while in Eastland in company with Judge Wallace Hawkins, we came to certain agreements relative to the continuation of your bank another year under the present management with a hope that at least much of your losses can be eliminated and I herewith hand you, as I have recorded from memorandum, the various agreements that we entered into verbally while in your office.

"The losses in your bank are regarded as very large indeed and if pressed at this time would far exceed your capital stock and undivided profits. It was developed at this interview that it was thought by everyone concerned that twelve months' work with your paper and the good prospects now of better business in your community would reduce your losses very materially. Hence the department has decided to allow you to continue throughout this year without interruption, with a view that you may reduce to a minimum the losses now believed to be in your assets, the exact amount of said losses to be determined by January 1, 1924.

"It is evident and is conceded that an assessment of 100% is necessary at this time, but same is waived by the department with the promise that the directors will have an assessment of 100% paid in on or about January 1, 1924, requiring each and every stockholder where it is possible to make arrangements at once for the payment of same, said payment, however, to be deferred to or about January 1, 1924, each stockholder to make his own security, acceptable to this department, for the deferred payment of the respective assessments and the same to be completed at the earliest date that is reasonable and practicable, and no director or stockholder is to be personally liable beyond his or her 100% assessment on the shares of stock owned by him or her, and the directors do not guarantee collection of assessment.

"On that date, January 1, 1924, the department will go over all of your assets thoroughly and determine at that time the losses of your

institution and unless the losses are reduced so that your capital stock will not be impaired, the Guaranty fund will take care of all the losses outside of your good assets and 100% assessments as hereinafter provided and perfect a reorganization of your institution, giving the present owners or the owners at that time the preference on any sale made of the assets to the proposed organization. All of this, of course, is based on the assumption that a satisfactory arrangement can be made with your bank or the owners at that time.

"The doubtful paper and other paper thought to be losses shall be segregated and listed within the next few days on lines and class made by the late Mr. Diggs at the last examination, any known changes to be made and corrected and said list to be appended to this letter. During this year any other losses made by the bank shall be charged to the undivided profits that accrue during this year. Any losses arising out of the good paper or any paper that may be taken into the bank during this year may be charged to any profits that may accrue. After such losses have been charged out, if any, the first $10,000.00 profits accruing during this year shall be set aside for the use of the present owners of the bank to pay the assessment on the stock which is to be made at the close of the year. The second $10,000.00 thereafter and any part thereof which accrues shall be used to pay losses on the old paper classed as doubtful and losses. The third $10,000.00 profits or any part thereof shall go to the payment of the assessment to be made at the close of the year on the stockholders. And the fourth $10,000.00 or any part thereof that shall accrue shall be used in reducing the losses in the old paper now classed as losses or doubtful.

"The department is to recommend to your Board of Directors a competent and suitable person as one of the active vice presidents of your bank, giving him the full authority to assist in passing on any loans made during the year with your other active officers, and he is to be made a member of the discount board and no loan in excess of $1,000.00 one thousand dollars is to be made except on approval of the entire discount board. Also this vice president shall give the principal part of his time in working on the losses and doubtful paper in an effort to recoup, improve and collect as much as possible, the other officers of your bank to assist him in every way possible in that effort, and he shall not be restrained by your other officers and directors in doing everything that is legitimate and reasonable in the collection and recouperation of said losses and doubtful paper. His salary shall be reasonable and paid by the bank. It is contemplated, however, that the liquidation of the Security State Bank & Trust Company, Eastland and the Guaranty State Bank of Olden now being liquidated by Mr. J. R. Burnett may be brought over and liquidated through the First State Bank and in that case a rightful ratio of salary shall be paid by the department for the work done. The proportional ration shall be determined each month according to the work he may do and the time he may consume with the said liquidations and should it take as much as half of said vice president's time on the old liquidations, then the department shall pay half the salary.

"It is also contemplated that the department shall keep their account from any nearby liqui-

dations with the First State Bank and if practical shall add other deposits from other liquidations up to $100,000.00 in excess of the amount now held on deposit by the First State Bank. This amount cannot be definitely ascertained but it is the desire and promise of the department to increase the deposits $100,000.00, if at all practicable.

"The department, in case a reorganization is affected on January 1, 1924, or near that date and the present owners are the owners at that time of the First State Bank, shall be the reorganizers and buy the assets of the present bank, the banking house shall be valued at $110,000.00 and the furniture and fixtures at $26,000.00 as they now stand. However, in the signing of these agreements the owners of the First State Bank do not obligate themselves to take the banking house and furniture and fixtures at the price named, but they have an option from the department at these figures.

"Mar. 19th, 1923.
                                        "J. L. Chapman,
                "Com'r of Insurance and Banking.

"We, the directors of the First State Bank of Eastland have read the foregoing proposition and hereby subscribe to same and agree to the terms thereof this the ——— day of ———, 1923.
                              "H. P. Brelsford.
                              "W. A. Martin.
                              "T. L. Overby.
                              "A. L. Agate.
                              "C. U. Connellee.
                              "Wm. B. Sutton.

"Department of Insurance and Banking
      "J. L. Chapman, Commissioner
        "Austin, Texas, March 19, 1923.

"To the Directors of the First State Bank, Eastland, Texas—Gentlemen: Referring to the enclosed contract which we have signed, in duplicate, we have filled in on the second page, third paragraph, $1,000.00 as a maximum limit that may be loaned without the consent and approval of the whole discount board.

"The person that we send there to be appointed by you as Vice President, to represent the department, is to be a member of the Board together with others that you select. We also call your attention to one place in the third paragraph, of the First page of the contract, where you say that no stockholder shall be liable beyond 100% assessment, up to January 1, 1924. You will understand that any stockholder that has disposed of his stock any time within twelve months prior to this agreement, or twelve months prior to January 1, 1924, would be liable, or, in other words, no attempt is being made by this agreement to change the statute which provides that all stockholders are liable for assessments any time within twelve months from the time they sell or dispose of same.

"You may append this letter to both contracts, filling in the $1,000.00, on the duplicate of the original, in your own handwriting, and we are filling in the $1,000.00 in our handwriting on the duplicate.

"Our conversation with Mr. Overby was very satisfactory, and we are looking, when our man gets on the field, for them to work out some recoveries that will look like miracles, and we hope that we will not be disappointed in our expectations. We hope to have our man on the field there, within ten or fifteen days, you to

add your other director, when available to the agreement. Also, you are to begin to assemble your collateral and cash to cover this assessment, as we all admit that it must come, and we will expect you to put up the collateral and cash within the next sixty or ninety days, if possible.

"A letter is to be sent to the stockholders, when Mr. Overby gives the names as provided. When they put up cash, it may be deposited in your bank, until next December, at which time we will determine the amount which the Guaranty Fund must lose. This deposit should be placed in a special account, so that this department and the stockholders will be protected.

· "Yours very truly,
"J. L. Chapman, Com'r.
"4–24"

[1, 2] It will be observed that the name of the appellee, C. U. Connellee, is signed to the acceptance of this letter as one of the directors of the bank. He testified that he made his payment into this fund in January, 1923, upon being informed of the agreement between the directors and the commissioner; that he was not actually present at the meeting in which the agreement embodied in the letter and acceptance was made. Whether, as a matter of fact, it was paid at that time, or was paid prior to that time under the agreement with Ed Hall above referred to, we think that the character of the relationship existing between the appellee and the bank subsequent to the date of this letter and its acceptance must be determined by a construction of this written instrument. Whatever the relationship might have been prior to that time, it having been determined that the plan suggested by Ed Hall could not be consummated and the appellee's acceptance of the terms of this written contract having been voluntarily made by him after such determination, his rights are fixed thereby. We can give no other construction to the written contract than that the money to be deposited thereunder was paid for the purpose of continuing the bank as a going concern and for the benefit of the bank and its stockholders. This conclusion is strengthened by the testimony of appellee, himself. This testimony as given by him by deposition introduced in evidence is as follows:

"My name is C. U. Connellee. I live in Eastland, Eastland county. I did receive from the state banking commissioner, Chas. O. Austin, a few days ago, a letter, together with a notice of an assessment levied on' a certain number of shares of stock in the old First State Bank. I received that notice through the mails. As to how many shares of stock was concerned in that notice which I received, I had 30 shares, $3,000. I paid some kind of an assessment prior to January, 1924. I will explain how that was. I wasn't here at that meeting in 1923, in January, 1923, at the regular meeting of the stockholders of the bank. At that meeting, they told me that Mr. Chapman and one of his examiners were here; Mr. Overby told me that who was running the bank; and they told me they were going to make an assessment of 100 per cent. and the banking commissioner has

asked us to put up 100 per cent. as an assessment and it was to strengthen the bank, and if the bank was taken over the money we put up was to be used in a separate fund to be applied to our assessments. I put up $3,000, and in July I took down the $3,000, and the commissioner complained about me taking down the $3,000, and I put back $1,000 on the 8th of August, 1923, and that $1,000 was turned over to the banking commissioner when the bank failed. It was kept a separate fund. That is my understanding of it. * * *

"I wasn't present, you remember, but they said the commissioner was here and maybe one of the bank examiners. Some of the officers were here, and they threshed it out, and instead of closing the bank we put up an assessment of 100 per cent., and if the bank failed, they took it over, that was to be applied on our assessment. Mr. Overby was the one who told me that.

"I did not talk to Mr. Chapman, the ·commissioner, at that time· about the matter myself. I never saw Mr. Chapman until after this bank closed. Mr. Chapman never did, either in writing or otherwise, make any promise to me directly with respect to the bank, only he called on me for the balance of the money. That is the only time I had any communication with him about it. He called on me for $2,000 balance he claimed was due on the assessment, and I paid it to him the next day after he called on me, and I have his receipt for the full amount of the assessment. That was after the bank closed. As to. whether I didn't have any communication with him, I never saw Chapman or wrote him anything about it until afterward. As to whether or not I had anything from him before the bank closed about the matter, I don't recall. There might have been a letter from him, but I don't call it to mind.

"Mr. Overby told me the commissioner had been there and the stockholders put up 100· per cent. to tide the bank over, and if the bank was taken over it was to be used as a payment of the assessment. As to whether or not my answer to your question is that I paid the assessment by reason of what Mr. Overby said to me with respect to the meeting and·the understanding they had with the commissioner, and not on account of anything I received from the commissioner myself personally, I had nothing to do with the commissioner in any way. As to whether or not I discussed the matter with any other stockholders or directors before the bank closed, the matter of payment, the assessment, I think, Mr. Rogers, the matter was brought up in a meeting of directors afterwards and perhaps discussed, and it was understood they were all to put up their 100 per cent. and not to be placed in the general fund, but to be kept separate and to be applied, if the bank had to be taken over, on the assessment.

"I didn't understand at that time, or probably two years before the bank closed, that the capital stock of the bank had been wiped out by reason of losses which existed in the bank at that time; I didn't think the bank had failed. If it had that they would have taken it over. * * *

"Mr. Overby told me that in order· for the bank to continue the business that it was necessary for the stockholders to pay this assessment; that is what he said, that Mr. Chapman said he would let it go over the present if they

would strengthen it that 100 per cent., and I put mine up. It was agreed, Mr. Rogers, that they should carry it as a special fund for that purpose, not mix it up with anything else, but carry it for that purpose, if the bank failed. Whether or not the bank actually used the fund before the bank closed, I don't know. When I put the $1,000 back after I took down the $3,000, I put the $1,000 back with the same identical understanding with which I put the first $3,000 up. Turning it around then, I put the $3,000 up in the first instances on the same understanding and the same agreement that I put the $1,000 back the last time, because they said the commissioner objected to them letting me take it down and I put it back. The $1,000 I put back and the $3,000 I first put up was put up with the same understanding and under the same terms, that if the bank was taken over it was to be put on my part of the assessment; that is exactly what I did. * * *

"When I took down my $3,000 that balanced that account, and I had no money up, but I put back the $1,000, and when the bank closed you paid $2,000 additional, and it is that and the $1,000 I put back which I claim paid my $3,000 assessment. That is it."

This testimony and the written contract signed by appellee clearly establish the fact in our mind that the payment made by appellee was a voluntary payment made when the bank was a going concern, for the benefit of the bank and with the hope of saving the bank and the stockholders, to be used by the bank to enable it to continue as a going concern, and cannot be construed as a payment for the benefit of creditors for equal and ratable distribution among creditors upon the legal closing of the bank on account of insolvency.

[3] A stockholder who expressly participates in, and consents to, the use of funds for the purpose of strengthening the bank or building up its impaired capital stock, or for any other purpose than the ratable distribution thereof among its creditors, is charged with the knowledge of the law making it the duty of the banking commissioner to levy a 100 per cent. assessment against the stockholders upon the closing of the bank for the benefit of its creditors, and cannot be heard to say upon the closing of the bank, in answer to the suit to enforce such liability, that he has paid the assessment. We think this conclusion is supported by the same authorities cited by us in the case of Austin v. Fleming, supra. Chapman v. Hopper (Tex. Civ. App.) 261 S. W. 166; Markus v. Austin (Tex. Civ. App.) 284 S. W. 326; Delano v. Butler, 118 U. S. 634, 7 S. Ct. 39, 30 L. Ed. 260; Witters v. Sowles (C. C.) 32 F. 130; 3 R. C. L. p. 397, § 27.

We therefore conclude that the appellee cannot defend upon the ground that the relation of trustee and cestui que trust existed between the bank or T. L. Overby and him with relation to this fund at the date the bank was taken in charge by the commissioner.

[4] The plea of estoppel of the appellee based on the allegation that the fund paid by him was applied by the banking commissioner on obligations for which the guaranty fund would be liable, and that the guaranty fund had received the benefit thereof and was therefore estopped to assert liability against him, finds no support in this record. There is no evidence, as we understand the record, that this fund was so appropriated. The facts disclosed are that same was charged off by the vice president of the bank, who was acting in the dual capacity of an officer of the bank and representative of the banking department. A large per cent. of this assessment fund or trust fund was charged off to absorb a loss on account of the liquidation of the indebtedness of C. L. Garrett. It appears that Garrett had become indebted to the Guaranty State Bank prior to the time that the Guaranty State Bank was taken over by the First State Bank of Eastland, and that in settlement of the indebtedness he conveyed and assigned certain property, the value of which was less than the amount of his indebtedness. To absorb this loss, a book entry was made, charging off this amount against this fund. We do not construe this as any evidence whatever that this constituted a ratable distribution among the creditors of the bank of this assessment.

We therefore conclude that, even if the pleadings of appellee were amended, as suggested in our opinion in the Fleming Case, the evidence of the record would not support any plea of estoppel against the commissioner.

The other defenses pleaded by appellee are decided against him for the reasons stated in the Fleming Case.

[5] The appellee introduced in evidence a letter from the banking commissioner J. L. Chapman to him, dated February 1, 1924. In response to a notice that an assessment of $3,000 had been levied against him, he sent the commissioner a cashier's check for $2,000, stating in the letter that before the commissioner took over the bank he had paid $1,000 on the assessment. The $1,000 which he claims as payment of the assessment was the fund paid in to T. L. Overby as trustee or treasurer. In answer to the letter from the appellee to J. L. Chapman, commissioner, indorsing the check for $2,000, the commissioner wrote him under the date above named, stating that he acknowledged receipt of appellee's letter inclosing cashier's check for $2,000, "which covers the assessment levied against your stock in the First State Bank of Eastland." Appellee relies upon this letter as evidence of payment. We cannot give this letter the legal effect contended for by appellee. If the appellee was, in fact, then due the sum of $3,000, on his assessment, this liability could not be discharged by the payment of $2,000, and the statement by the banking commissioner that

such sum covered the assessment levied against appellee's stock could not have the legal effect of absolving the appellee from his obligation to the creditors of the bank.

For the reasons above set out and referred to, it is the judgment of this court that the judgment of the trial court be set aside and that judgment be here rendered in favor of appellant against appellee for the sum of $1,000, with 6 per cent. interest thereon from this date until paid, and it is so ordered.

Reversed and rendered.